Center. You can just hang on a minute. I mean, you can just hang on a minute. Let them get settled. Okay. All right, you can come on to the lectern. I think Mr. Crouch is about to speak. May I proceed, Your Honor? Yes, sir. You may begin.  May it please the Court. Thank you, Your Honor. My name is John Murrell. I am the Appeal Counsel for the appellants in this case, Cox Operating and Cox Offshore Oil. This case, Your Honors, involves a claim by the plaintiffs for damages that are grossly disproportionate to the value of the actual work they performed in this case. They seek that windfall by summary judgment, without a full trial on the merits, and based on arguments that we believe are not supported by Louisiana law, and of course because this case is here on diversity jurisdiction, Louisiana law governs. Cox certainly acknowledges the work that was done by the plaintiffs in the earlier stages of the negotiations. In fact, it's undisputed that when the exclusivity deadline was approaching at the end of October of 2015, and no deal had been consummated, Cox had a conversation with the plaintiffs and said, look, this doesn't look good, it doesn't look like we're going to get this deal done. We want to pay you for your services. Can you submit us an invoice? Now, in the briefing that's been done to the court in this case, there's a suggestion, and I think that suggestion was also in the court below in the briefing, that Cox is somehow trying to cheat the plaintiffs out of the payment for their services, that they're, I believe they even used the expression once in their briefs, that we're trying to bilk them out of what they're entitled to. That's simply not the case. Cox offered to pay them when the deal appeared to be going down, and that fact seems to be lost sometimes after Cox made that offer to them. When the negotiations restarted after the lapse of the exclusivity period, the plaintiffs were no longer involved in the transaction, and the deal was finally done on terms that were based on what Cox, excuse me, what the plaintiffs had originally proposed. Because of time limitations, I'm not going to address, I don't think I'll have time to address every argument in my brief, but certainly we stand by all of those arguments. The first argument I would like to start with is that the district court erred when it held that the procuring cause doctrine did not apply to the letter agreement. It's Cox's position in this case, it was Cox's position in the lower court, it's Cox's position here, that the plaintiffs are not entitled to broker commissions because they were not the procuring cause of the bonds that were eventually placed. Now, obviously the district court disagreed with that. The district court held that because it went through a fairly detailed analysis of the agreement, it concluded this is not a broker agreement. This is, I don't think the court used the expression inominate, but I think that's what it was. It's a contract that doesn't neatly fall into any particular category. It's not a broker agreement, and therefore the district court concluded the procuring cause doctrine does not apply. It's Cox's position that the application of the procuring cause doctrine is not determined by the nature of the contract. There's nothing in the Louisiana cases that have been cited by both parties that limits application of the doctrine to broker agreements. The district court did not cite any cases that held that. The plaintiffs have not cited any cases that held that, and in fact, we cited the Gulf Marine case, which was decided under Louisiana law, but arose in the Eastern District of Louisiana. There was no agreement between the parties in that case. Let me ask you this. Nobody's, you know, the curve is from there, but the district court judge here, Judge Guidry, as you know, came off the Louisiana Supreme Court for eons, years of service. No doubt, procuring cause percolated as a concept in the Louisiana Supreme Court a number of times, etc., etc., and that's not to say it couldn't be wrong, but I guess my question is, where is it you say he missed it in terms of understanding procuring cause with respect to Louisiana law? Again, I'm not saying just because of that. We all make mistakes, but I'm just trying to drill down, no pun intended, into, you know, where he missed it, this argument. Either it's more related to brokerage contracts or not, or such a term of art in the industry that has a unique meaning. Everybody's looking at the same cases. I'm just trying to cut to, you know . . .          You do it. You do it. You do it. You do it. You do it. You do it. You do it. You do it. You do it. You do it.     Yeah, you do it. Okay. Thank you. Thank you. Where did the trial court go off base? Was it hewing too closely to the . . . Well, I think it went . . . and certainly recognized, as you point out, Judge Stewart, that the district court judge in this case spent years and was a very well and highly respected judge on the Louisiana Supreme Court. That's part of the bargain I stepped into when I agreed to represent Cox on appeal. I . . . As is my colleague here . . . I am well aware of that, Your Honor. . . . . as a result, if we really get off . . . I recognize that, but I think that, I guess, and I'm not sure if this is a direct response to your question, but trying to get at the question you're posing, I think where the the standard for summary judgment is not only are there no material issue facts but the movement is entitled to judgment as a matter of law. And we don't believe there's any laws that we have been able to find nor that have been cited by the other side or by the judge himself below that limits application. We're arguing that the procuring doctrine is what it is and it applies to this case and it's . . . it's the plaintiffs and the judge in his opinion who tried to limit the especially at the summary judgment stage. If you're going to limit the doctrine, if you're going to constrain its application to something less, there ought to be some support for that and we just don't see that there is. So I'm not sure if that really addresses your question, but . . . No, I think it does. And because it's Cox's position that the procuring cost doctrine applies in this case, we believe there's no genuine issue of material fact but that the plaintiffs were not a procuring cause of these bonds. We cited the Farnsworth factors in our brief. The Louisiana courts have hammered out a four-step test to deal with when is a party a procuring cause. And we believe application of those factors in this case suggests Cox is entitled to judgment as a matter of law. Cox filed a motion for summary judgment in the district court on this issue. Applying those Farnsworth factors, the plaintiffs did not bring this transaction to Cox. The plaintiffs were not part of the final negotiations that culminated in the deal and the final terms of the deal itself and the final terms of the bonds themselves were much different than what the plaintiffs had been proposing when they were consulting with Cox. So we believe there's no genuine issue but that they were not a procuring cause and therefore Cox is entitled to judgment as a matter of law. At the very least, if the court disagrees with that analysis, I think there's a genuine issue of material fact on whether the plaintiffs were or were not a procuring cause of the bonds. Your initial position is no fact dispute but that the summary judgment should in order to your client as a matter of law. That is correct, Your Honor. That's your initial position and then you say, but if not, at worst, the factual issue needed question out. That is correct, Your Honor. Now, the plaintiffs. Let me just ask you one follow-up. Yes, sir. Assuming the latter, if we accepted your argument and it went back, what would the summary judgment proceeding be like? What would be the development factually or otherwise to flesh out? Well, I think that, first of all, summary judgment by its very nature has a limited record. It's whatever the point. Yeah, I'm just trying to get a taste for assuming we were to say, okay, neither one of them is entitled to as a matter of law. There's some fact that you should just go back and dip it out. I'm just trying to get kind of a one, two, three from you. If that were the case, what is it that would flesh out in the summary judgment procedure to endure to your client's favor or not? Just trying to conceptualize . . . Understood and I confess I'm a little bit hamstrung in answering that question because I did not . . . we did not represent Cox in the district court so I've certainly tried to familiarize myself with the summary judgment record but I can't speak to all of the other things. Obviously, my focus once I got involved was on the summary judgment record. It's a hard question for me to answer but I certainly think that a full factual vetting of those issues . . . Well, how about just going to trials? I'm sorry? How about it just goes to trials? I guess that was . . . I did not articulate that. That's exactly what we believe should happen, Judge Barksdale. I don't know that there's any discovery left to flesh out nor do I believe the discovery deadlines have lapsed and that's when you typically do your motions for summary judgment but I believe this requires a full trial on the merits. I guess the final thing I want to address before I save the rest of my time for the plaintiffs have argued and I think the district court assumed that even if the procuring cause doctrine applies to this agreement, well, why aren't the parties . . . why weren't the parties free to simply contract around it? It provides a suppletive law but why can't the parties simply contract around the procuring cause doctrine? That's the argument that I think the plaintiffs made and I think that was implicit in what Judge Guidry ruled. My response to that is that, first of all, the issue of whether the parties were free to derogate was not raised at all in the district court and it's not that either side forgot to raise an argument. It's the way the issue was framed in the district court. Cox filed a motion for summary judgment and the plaintiffs . . . and argued you weren't the procuring cause. The plaintiffs responded and said, but the procuring cause doctrine doesn't apply to this agreement and that's when the parties began. The issue had been framed as whether or not the procuring cause doctrine ever applied in the first instance to this letter agreement. The parties never got to the issue of whether or not they could derogate from the procuring cause doctrine. Now, in our brief to this court, in our original brief, we made the point that if the procuring cause doctrine applies, you're not necessarily at liberty to write it out of existence in your contract but some laws are suppletive, some are mandatory. In this case, Article 7 of the Louisiana Civil Code states, persons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act of such laws is an absolute nullity. I think a perfect analogy, we're all lawyers in this room, Rule 1.5E of the Rules of Professional Conduct says that lawyers can't split a fee unless they each render, I believe the phrase is meaningful legal services. The point is not the standard about meaningful legal services. The point is no one would ever suggest that lawyers are free to derogate from that law. That's a law that establishes circumstances under which parties can share fees and lawyers are not free to disregard that and for the same reason we believe, lawyers are not free and parties are not free to derogate from the procuring cause doctrine. It doesn't just roll off the tongue. I'm out of time, Your Honor. Unless the court has any further questions here on my main argument, I'll take my seat and wait for rebuttal. All right. Thank you, sir. You've preserved your rebuttal, Seth. All right. Let's see. Mr. Sternberg. Good morning, Your Honors. I'm Scott Sternberg here on behalf of the Potomac Marine Underwriters and Delta. We're the appellees in this matter. I want to briefly attempt to address Judge Stewart, Judge Barksdale, your questions. The . . . what would happen if this court reversed? I think that Judge Guidry has made it very clear what facts he thinks are important. You notice that my esteemed opponent came up here and immediately started talking about testimony and dates and things that are not in the contract. The reality is that the parties have stipulated that this contract in front of you right now, which if you hold it up to the light, it's about one page. It's a page and a quarter with the appropriate address lines. This contract in front of you was negotiated and signed in good faith, and it compensates the plaintiffs, the appellees, for the work that they have already performed on behalf of Cox. The fact that Cox is trying to work in a October 30, 2015, cutoff date, that is nowhere in that contract. It is in one line of testimony, in one deposition, after the fact. And as your Honor has appropriately noted, Judge Greg Guidry is not ignorant to the civilian tradition, and he is not ignorant to the civil code. Now, Judge Barksdale, you and I are both from Mississippi, but you've certainly presided over numerous Louisiana cases, and I've had to learn it myself. But in Louisiana, we start with the contract, and the question of whether a contract is enforceable is a question of law, particularly when it is unambiguous and clear, which Judge Guidry found twice, not once, but twice in this case, because the first summary judgment that was filed was whether or not the contract was clear and unambiguous on liability. We were successful in that summary judgment. Judge Guidry found that the contract was exceedingly clear in that it found a scheme to pay my clients for the work that they had already performed and required no further work from them, even though they continued to work after the contract was signed. Because this contract provided for an interesting way to pay my clients, does not make the contract a brokerage agreement. A brokerage agreement is a nominant contract, right? A contract with a name. This is an innominate contract, and that's what Judge Guidry, the former Louisiana Supreme Court judge, found. And incidentally, I want to point out that what Judge Guidry actually found, this is in the record at 536, was that the letter agreement is a contract between Cox and Petro Marine rather than a broker agreement. And therefore, and this is important, the procuring cause doctrine by the contract's own terms is not applicable. Judge Guidry did not find that the procuring cause doctrine doesn't apply to a regular contract. That's not what he found. At record 536, it says that the procuring cause doctrine does not apply to this contract by its own terms. And why is that? Because in the contract itself, which is in front of you right now, your honors, in the very first paragraph, line six, Delta and Petro have already provided and may continue to provide certain consulting services to Cox with regard to the acquisition of Chevron assets and on regulatory issues regarding financial assurances to the federal government and oil and gas companies. Next paragraph, compensation due to Delta and or Petro, my clients, for these services shall be due and payable on the initial placement and any subsequent renewals of any surety bonding placed on behalf of any Cox entity which resulted from the acquisition by Cox of interest in certain assets of Gulf of Mexico in the 2015 offering, key term here, regardless of the brokers or agents involved. It then goes on to create a split system. And in the record, your honors, 658, Cox confirmed that McGriff, who ultimately placed the brokerage bonds, ultimately placed the bonds with Aspen American Insurance, could split, could split the commissions. They confirmed that before they signed the contract. So is this a brokerage agreement? No, it's not. It's a contract. And the contract provides for an interesting way to pay my clients. And that is why when my clients determined that they had not been named a and I said, can I see the contract, please? You don't need to hear your dialogue with your client, Mr. Sternberg. I apologize, your honor. But the first thing I did is the first thing that you should do, which is look at the contract, because the appellant wants to talk about testimony and all kinds of parole evidence. And I just want you to look at the two pages, because in my mind and in Judge Guidry's mind twice, it's exceedingly clear and unambiguous. As to liability, the contract required payment and it required Cox to name Petra Marina's co-broker. It says that in the contract. There's been an argument raised by my esteemed opponent that there's some confusion as to who could name the co-broker. Judge Guidry dispensed with that quite, quite simply in his 13-page summary judgment ruling in January of 2021, where he said, who else could name my clients, the appellees, as the co-broker but the person who owned the assets and was operating the assets? And that's also confirmed by the testimony both of my client and of Cox. And keep in mind, your honors, Cox sought my client out and said, we want you to work for free. My client took the risk and said, I will work for you, but you must give me this. And it's 65 percent of the brokerage commissions for a couple of years, and then after that, 35 percent. A little bit of a flip. So he took a risk, and he should be paid for it. If Cox had come to my client and said, we would like for you to place bonds on our Continental Shelf assets. That would be a brokerage agreement. This is not that. I want to briefly talk about Gulf Marine Equipment because my esteemed opponent talked about it. Gulf Marine Equipment is a brokerage contract. In that case, you had a shipbuilder who hired a broker to go find somebody to build him some ships. Then the broker sued the operator and said, no, I'm the procuring cause of your later contract with one of my contacts. That's not what happened here. We're not saying that we were required to be the only broker involved. In fact, we contemplated that we would be a co-broker. And those terms were agreed to not once but twice by both parties. And the number of stipulations in this case is quite significant, Your 11 pages of stipulations that the parties stipulated to. Things like the fact that Chevron was offering assets on the Outer Continental Shelf, that Cox had never operated on the Continental Shelf before, had never had any bonds before for operating on the Outer Continental Shelf, and that they needed my clients to assist them in acquiring the Chevron assets. That they had never posted any bonds with Bohm, that McGriff had brokered the Aspen bonds for them, and that McGriff had agreed that it could share commissions. The question, then, is why didn't they just name us? Well, in the depositions, Cox stated they took zero efforts to effectuate the contract. And when we sued them, we sued them for breach of contract because the contract says they had to name us as co-broker. Now, in the stipulations, there's been a suggestion in the briefing that perhaps we didn't plead this right, that we should have pled to be named as the co-broker, but we did actually do that in the pleadings, particularly at paragraph 37C. We asked for specific performance of the contract, which was attached as Federal Rule of Civil Procedure 10C. Attaching an exhibit incorporates its terms into the complaint itself. We also prayed for a breach of the agreement and a declaratory judgment. But even later, when they stipulated to this judgment, Cox decided that rather than have a trial, they would prefer to stipulate to a judgment to see your honors and see if they could get the summary judgments reversed. They stipulated at Record 465 that the pleadings and the evidence support the following relief. Cox may choose to make Petro Marine co-broker until it terminates by its own terms. By it, it means the contract. Cox can either pay us the money that they owe us, or they can designate us as a co-broker like they were supposed to do in the contract. The idea that the two months between the signing of this contract and the signing of the deal between Cox and Chevron, so much changed is nowhere in this record. It's not here. The only thing that changed was that Cox realized that they didn't want to pay my clients, and that's why we had to sue them. That's why we sent them a demand letter. That's why they sent us a termination letter. It's a pretty classic business dispute. Why? I don't know. But the reality is that we provided services for which we were uncompensated. The method for compensation is this two-page document. The fact that Mr. Dykes came to us on October 30, 2015, and said, will you invoice me for your hours? And we said, no, we have a contract. Why would we invoice you for our hours? Mr. Murrell says that Mr. Dykes said the deal was dead, but then two months later, they inked a deal, not even two months later, about 31 days later, they inked a deal. So the deal wasn't dead. They were trying to get out of not paying us the amount of money that we're owed under the contract. As for the term, I just want to briefly note that it seems that the parties agree as to what law applies in the civilian tradition particularly. There's an argument from the appellant that this is a contract with an uncertain but determinable end in that this contract says that for as long as assets on our continental shelf that result from the 2015 Chevron offering, that my clients will be paid their commissions, or the amount of the commissions, excuse me. In Caddo Gas, it was about a pipeline that was going to be used for a certain amount of time, and they didn't know how long it would be used, but they knew that at some point, the pipeline would cease to be used. That's exactly what Mr. Sewell testified to. It's exactly what Mr. Dykes testified to. At some point, Cox might sell these assets. At some point, Cox may go bankrupt and lose the assets. And at that time, the term of the contract is determinable because we know that at some point, assuming that everything ends, they will no longer operate these assets. But for now, they're operating them. So it's a contract with an uncertain but determinable term, not an uncertain and undeterminable term. The Williams case that the appellants cite is inapplicable because that just dealt with FEMA trailers, and it said for as long as FEMA needs them. Well, what does that mean? Who knows the next hurricane, the next disaster? We are talking about a particular group of assets that were purchased from a particular company that the appellant has stipulated to. For as long as those assets are operated on the Outer Continental Shelf, my clients are to be paid their share of the commissions. And in the stipulated form of judgment, which Judge Guidry signed, Cox has the option to either name us as the co-broker or pay us the money. So that's the case in a nutshell. The fact-finding that would be found at the trial is no different than what Judge Guidry has already found in his rulings. The self-serving testimony of Mr. Dykes that this contract terminated on October 30th, 2015 is really the only argument that I can see that might even remotely create a genuine issue of material fact. But that is one page of testimony after the fact, and it's nowhere in the contract. So with a contract that does not lead to absurd consequences, under Louisiana law, your honors are obligated to give, interpret the contract in light of all the provisions to give meaning suggested by the contract as a whole. And the meaning that's suggested— —point to us in this contract that would justify the right-of-way and area commissions on the right-of-way and area bonds, which are required by the federal government, as I understand it, to operate on the Outer Continental Shelf. Thank you, your honor. That's a very good question. In the contract, it says, compensation in paragraph two due to Delta and Petro for these services shall be due on the initial placement of any subsequent renewals of— and this is the key, this is what Judge Guidry found— any surety bonding placed on behalf of any Cox entity which resulted from the acquisition by Cox of interests— Right-of-way and area bond, a surety bond. And in the fourth paragraph, your honor, it states that Petro Marine will be made co-brokers on all bonds placed on properties purchased from Chevron. The bonding that Judge Guidry found that the bonding resulted from the acquisition of the Chevron assets, he found that that was the key language. And that the right-of-way and the area-wide bond were resulting from the Chevron assets because Cox stipulated in its stipulations that it had never had the bonding before and had to get it when it acquired the Chevron assets. So because the contract doesn't exclude the right-of-way bonds or the area-wide bonds, you know, Judge Guidry found that it was included. And of course, stipulation number 51 at record 63 is an important stipulation because Cox says that they never had any of these bonds before the actual issuance of the Asset Sale and Purchase Agreement which was signed in December of 2015. This is a cherry-picking of the language by the appellant, your honor, Judge Barksdale, with this any surety bonding placed on behalf of any Cox entity is extremely broad and it is admitted by Cox that Petra Marine had advised Cox that they would need this bonding if they acquired the Chevron assets and that's in the record at 2034. And that's actually an admitted fact in the Motion for Summary Judgment Statement of Uncontested Material Facts. So the fact that our clients advise them, hey, you will need these bonds, makes it pretty clear that the contract encapsulates all bonds. It says any surety bonding placed on behalf of Cox. That goes back to my question again. Why is a right-of-way and area-wide bond a, quote, surety, close quote bond? Um, your honor, I'm not an expert in bonds, but I'm not aware of anything in the record that would dispute that that bond is an surety bond. I mean, I understand that it is called a right-of-way. I understand a surety bond in general assures payment of the purchase price. It assures that funds will be available for the purchase of the property, not that it assures there'll be an area-wide or a right-of-way bond. I believe those government bonds, your honor, because they were required to be issued after the purchase of the Chevron assets is why Judge Guidry found that they were included. I don't have that order in front of me, your honor, but if you'd like, I'm happy to supplement my briefing with any argument that your honor would like addressed. And unless your honors have any other questions, I would ask that you affirm the summary judgment, both summary judgments and the stipulated judgment that Judge Guidry found. He certainly took his time. One of the summary judgments took more than eight months. There was a lot of testimony. There was a lot of argument. But at the end of the day, he came back to this two-page document and found breach. And he also found that my clients were entitled to compensation for the work that they had already performed, no matter the procuring cause argument. Thank you. Counsel, I would just note that in the future, you might want to consider, you and your co-counsel, the tone you use in briefs to this court. It was really off-putting at times. Yes, your honor. I actually called Mr. Murrell yesterday to apologize. I recognize that as well. Thank you, your honor. All right, back to you, sir. And just in brief follow-up, your honor, Mr. Sternberg did call me yesterday, and we had a discussion that there was some spirited briefing on both sides. And we recognize that and certainly recognize our obligations, both of us, to this court. So one thing I would like to point out on rebuttal, I had a whole host of issues I wanted to address on direct. But as is often the case in oral arguments, I got through my first one, the procuring cause doctrine. And whether as a matter of law, this contract is an absolute nullity. Because even if the procuring cause doctrine is merely a suppletive law, it's our position, it's a mandatory law and cannot be derogated from. So when Mr. Sternberg came up here and argued the appellee's position, there was nothing on that. He said several times, well, we took the parties, my client and his client, came up with an interesting way to pay them for past services, as I believe the language he said. But if that interesting way to pay for the services is to name them as co-brokers on bonds they were not the procuring cause for, that's an impermissible. It may be interesting, it's also impermissible. And I heard nothing in the argument by the appellees about that issue. That was the sole, I don't know if I should be worried or not, that I spent all this time up here addressing that issue, and they didn't respond to it at all. But I would simply note, there's been no response to that here at oral argument. I thought I understood Mr. Sternberg to say that there was a broker agreement in the Gulf Marine case. Well, the response to that is yes, but. The parties had a broker agreement, and the broker agreement terminated more than a year before these bonds were actually purchased in that case. And so the discussion of that case was, well, there's no agreement between them. Does the procuring cause analysis still apply? And the court said yes. So I don't think there was a broker agreement, but there was not a broker agreement at the time that those bonds came into being. That's the significant point. The court still went through the procuring cause analysis. Mr. Sternberg, when he stood up here, spoke and said that in the two months between the end of the exclusivity period that ended on October 30th, 2015, and the time that the deal, I think the final deal, was not actually done until April of the following year. But he is correct. There was some kind of intermediate, I don't know if it was a term sheet, they called it ASPA, and it was an acronym that I don't recall what it stood for. But the point is, there was an agreement. Shortly, several months after the expiration of the exclusivity period, and he said nothing had changed. I don't think that's correct. I think it's undisputed that certainly the bonds themselves, there's a lot of testimony in the record that the bonds that were being proposed by the plaintiffs when they were still involved in the deal were dual obligee bonds. And if I was a bond lawyer, I might be able to explain what that is. I'm not, so I can't. But I believe it's undisputed that certainly the most fundamental point of the plaintiff's role in this case was to advise Cox on bonding. And the bonds that were placed in this case, ultimately, were different. And I believe it's undisputed they were different from the bonds that were being proposed by the plaintiffs. Excuse me, Your Honor. Finally, with respect to the right-of-way and area-wide bonds, I recognize that Judge Guidry focused on the language that said all bonds that, all surety bonds that result from the acquisition by Cox of interest and assets. But the exact same contract, two paragraphs below, says they will be made co-broker, quote, on all bonds placed on properties purchased from Chevron. So there's clearly some ambiguity in the contract there. And that is not proper for summary judgment, Your Honors. Thank you very much. Thank you, sir. All right. Thank you, counsel, for the briefing and your argument in the case. The case will be submitted and we will get it.